## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, SIERRA CLUB, WEST VIRGINIA HIGHLANDS CONSERVANCY, and OHIO VALLEY ENVIRONMENTAL COALITION,<br><br>     Plaintiffs,<br><br>  v.<br><br>UNITED STATES FISH AND WILDLIFE SERVICE; DAVID BERNHARDT, in his official capacity as Acting Secretary of the U.S. Department of the Interior; MARGARET EVERSON, in her official capacity as Acting Director of U.S. Fish and Wildlife Service; U.S. OFFICE OF SURFACE MINING RECLAMATION AND ENFORCEMENT; GLENDA OWENS, in her official capacity as Acting Director of the Office of Surface Mining Reclamation and Enforcement,<br><br>     Defendants. | Case No. 2:19-cv-632 _____<br><br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## I.    INTRODUCTION

1.    In this civil action for declaratory and injunctive relief, Plaintiffs Center for Biological Diversity, Sierra Club, West Virginia Highlands Conservancy, and Ohio Valley Environmental Coalition (the "Conservation Groups") challenge the failure of Defendants to comply with their duties under the Endangered Species Act, 16 U.S.C. §§ 1531–1544 ("ESA" or "Act"), regarding the impacts to imperiled species from surface coal mining activities regulated pursuant to the Surface Mining Control and Reclamation Act, 30 U.S.C. §§ 1201–1328 ("SMCRA"), regulatory program.

2.    Defendants continue to rely on a *1996 Biological Opinion and Conference Report on Surface Coal Mining and Reclamation Operations under the Surface Mining Control and*

*Reclamation Act of 1977* ("1996 Biological Opinion") and accompanying incidental take statement ("ITS") for ESA compliance.  However, the 1996 Biological Opinion does not comply with ESA section 7(a)(2) or its implementing regulations and the U.S. Fish and Wildlife Service (the "Service") has admitted that even full adherence to its terms will not prevent jeopardy to listed species or adverse modification of critical habitat.  Consequently, Defendants' reliance on that Biological Opinion is in contravention of Section 7 of the ESA and is arbitrary and capricious agency action in violation of the Administrative Procedure Act ("APA").

3.      The Service has acknowledged that new information reveals the process for ESA compliance set forth in the 1996 Biological Opinion has failed to insure that species are protected from the adverse effects of surface coal mining, and new species listings—including the recent listing of the Big Sandy crayfish and the Guyandotte River crayfish—require OSMRE and the Service to revisit the efficacy the 1996 Biological Opinion.  Thus, reinitiation of consultation on the SMCRA program is required pursuant to ESA Section (7)(a)(2) and the applicable regulation at 50 C.F.R. § 402.16 to prevent jeopardy to listed species.

4.      In April of 2017, the Office of Surface Mining Reclamation and Enforcement ("OSMRE") and the Service reinitiated formal ESA Section 7 consultation on the SMCRA program to replace the 1996 Biological Opinion with a new programmatic ESA consultation.  However, more than two years later, that consultation has continued for an unlawful and unreasonable time, during which Defendants have continued to rely on what the Service has conceded is an outdated, incomplete, and inadequate Biological Opinion.  The failure to complete Section 7 consultation on the SMCRA program within a reasonable time, while relying on an unlawful Biological Opinion that is jeopardizing the continued existence of multiple species, violates both section 7(a)(2) of the ESA, and the APA, 5 U.S.C. § 706(1).

2

5.      The continued reliance on the 1996 Biological Opinion further violates OSMRE's and the Service's duty to carry out programs for the conservation (*i.e.* recovery) of listed species and to insure that agency actions are undertaken consistent with the purposes of the ESA pursuant to ESA Section 7(a)(1).  It is also in direct violation of the clear requirements of ESA Section 7(d), which prevents any irretrievable commitment of resources pending completion of the Section 7 consultation process.  Given the Service's statements regarding the ineffectiveness of the 1996 Biological Opinion to protect listed species, continued reliance on that opinion to insure compliance with the ESA is patently arbitrary and capricious, in violation of the ESA and APA.

6.      Following the reinitiation of consultation in 2017, regulatory authorities— including the West Virginia Department of Environmental Protection ("WVDEP")—have continued to permit mines in reliance on the unlawful 1996 Biological Opinion.  WVDEP also continues to permit coal mining activities in reliance on unlawful guidance adopted by the Service to implement the 1996 Biological Opinion regarding protection and enhancement plans ("PEPs") for the Big Sandy crayfish and Guyandotte River crayfish.

7.      Under direction from political appointees in the Interior Department, the Service abandoned crayfish PEP guidance developed by its own regional office, and adopted guidance developed by WVDEP that does not comply with the applicable regulations at 30 C.F.R. §780.16 or the ESA's best available science mandate.  Furthermore, the crayfish guidance has not undergone Section 7 consultation.  The continued reliance on this guidance and on the 1996 Biological Opinion is jeopardizing the continued existence of these highly imperiled crayfish species.

8.      Therefore, the Conservation Groups bring suit to compel the Service and OSMRE to complete formal programmatic consultation regarding the impacts of SMCRA-regulated coal

3

mining on listed species by a date certain, to insure that coal mining activities do not continue to jeopardize listed species or destroy or adversely modify their critical habitat.  The Conservation Groups further bring suit to declare the 1996 Biological Opinion unlawful, and that the Service's, OSMRE's and state regulatory authorities' continued reliance on the 1996 Biological Opinion is arbitrary and capricious in violation of the APA and ESA, and to enjoin any further reliance on that opinion.  The Conservation Groups also ask the Court to declare that the Service's crayfish guidance is in violation of the requirements of the ESA, and to enjoin any further reliance on that guidance to insure that no mining activities take place that will jeopardize the continued existence of listed crayfish.

## II.    JURISDICTION AND VENUE

9.     This court has jurisdiction over this action pursuant to 16 U.S.C. § 1540(c) (actions under the ESA); 16 U.S.C. § 1540(g) (ESA citizen suit provision); 5 U.S.C. § 702 (Administrative Procedure Act); 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1346 (action against the United States); 28 U.S.C. § 1361 (action to compel an officer of the United States to perform his or her duty); and 28 U.S.C. § 2201-02 (power to issue declaratory judgments in cases of actual controversy).

10.     By written notice sent by electronic mail and certified mail on May 10, 2019, Plaintiffs informed Defendants of their violations more than sixty days prior to the filing of this Complaint, as required by the Endangered Species Act.  16 U.S.C. § 1540(g).

11.     Plaintiffs notice letter demanded that the Service and OSMRE satisfy their statutory obligations to complete ESA Section 7 consultation regarding the impacts to listed species from SMCRA-regulated mining, and to discontinue their reliance on the 1996 Biological Opinion and unlawful crayfish guidance.  The Service and OSMRE have failed to remedy the alleged violations, and therefore an actual, justiciable controversy exists within the meaning of 28 U.S.C. § 2201(a).

12.     Venue is proper in the Southern District of West Virginia pursuant to 28 U.S.C. §

1391(e), as a substantial part of the events or omissions giving rise to the claim occur in this District and Defendants have offices in this District.

### III.   PARTIES

13.   Plaintiff CENTER FOR BIOLOGICAL DIVERSITY is a non-profit 501(c)(3) corporation with offices in California, Washington, Oregon, Arizona, Nevada, New Mexico, Colorado, Illinois, Minnesota, New York, Virginia, North Carolina, Florida, and Washington, D.C.  Through science, policy, and law, the Center works to secure a future for all species, great or small, hovering on the brink of extinction. The Center has 67,373 members throughout the United States and the world.  These members include those who have viewed, photographed, and otherwise appreciated threatened and endangered species that may be affected by surface coal mining, who live near these species, habitats, and ecosystems, and who intend to visit and enjoy these species, habitats and ecosystems in the future.

14.   Plaintiff OHIO VALLEY ENVIRONMENTAL COALITION is a nonprofit organization incorporated in Ohio.  Its principal place of business is in Huntington, West Virginia. It has approximately 400 members.  Its mission is to organize and maintain a diverse grassroots organization dedicated to the improvement and preservation of the environment through education, grassroots organizing, coalition building, leadership development, and media outreach. The Coalition has focused on water quality and mining issues and is a leading source of information about mining pollution and impacts in West Virginia.

15.   Plaintiff SIERRA CLUB is a nonprofit corporation incorporated in California, with more than 768,000 members and supporters nationwide, including approximately 2,600 members who reside in West Virginia and belong to its West Virginia Chapter.  The Sierra Club is dedicated to exploring, enjoying, and protecting the wild places of the Earth; to practicing and promoting the responsible use of Earth's resources and ecosystems; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carrying out these objectives.  The Sierra Club's concerns encompass the

exploration, enjoyment and protection of forests and surface waters in West Virginia.

16.    Plaintiff WEST VIRGINIA HIGHLANDS CONSERVANCY is a nonprofit organization incorporated in West Virginia in 1967.  Its volunteer board of directors and approximately 1,500 members work for the conservation and wise management of West Virginia's natural resources.  As one of West Virginia's oldest environmental activist organizations, the West Virginia Highlands Conservancy is dedicated to protecting clean air, clean water, forests, streams, mountains and the health and welfare of the people that live in the Mountain State and for those who visit to recreate.

17.    Plaintiffs' members and staff have researched, studied, observed, and sought protection for endangered species that are adversely affected by coal mining activities. Furthermore, Plaintiffs' members and staff have visited and observed, or sought out, threatened and endangered species that are imperiled by SMCRA-regulated coal mining.  Plaintiffs' members and staff intend to continue to visit and observe, or attempt to visit and observe, these species in the near future.  Plaintiffs' members and staff derive scientific, recreational, conservation, and aesthetic benefits from rare species' existence in the wild, and their interest in maintaining the species inhabiting the forests and rivers of areas affected by coal mining is entirely dependent on the continued existence of healthy, sustainable, and accessible ecosystems and populations.  Any activities that destroy, degrade, or diminish these areas, or that kill, injure, harm, harass, or displace populations of listed species interfere with Plaintiffs' staff and members' use and enjoyment of the areas and species.

18.    Plaintiffs' members and staff include scientists who study the Guyandotte River crayfish and Big Sandy crayfish, and whose interests in studying and enjoying these species and their habitats are entirely dependent on the continued existence of the species.  This includes the scientist who discovered the Guyandotte River crayfish in 2014, and who has written reports on the evolution, life history and conservation status of the Guyandotte River and Big Sandy crayfish, and who plans to return to the last remaining habitat for these species in West Virginia to continue studying and publishing articles on them.  Any action that interferes with and harms

6

these species also harms those members' interest and enjoyment in studying those species.  Any loss of individuals or habitat would hamper their ability to undertake such research in the future, thereby harming their academic and aesthetic interests in those species.

19.     Activities authorized by Defendants directly and irreparably injure Plaintiffs' interests.  The Service's and OSMRE's failure to comply with the requirements of the ESA and APA delays, avoids and undermines protections that are necessary to secure Plaintiffs' interests in the existence of listed species and their critical habitat.

20.     Plaintiffs have also suffered informational and procedural injuries from Defendants' failure to properly oversee the implementation of the ESA in the permitting of coal mining activities, which oversight must include full and adequate analysis of the impacts to listed species.  These injuries are connected to Plaintiffs' substantive conservation, recreational, scientific, and aesthetic interests.  Plaintiffs' members and staff rely on Defendants to comply with the requirements of the ESA and prepare adequate environmental analyses as required by the statute.  Plaintiffs rely on these analyses to achieve their organizational purposes, including monitoring the impacts of coal mining on listed species; monitoring legal compliance concerning species' management; educating members, directors, staff, and the public concerning species management and the state of the environment; and advocating for policies that protect habitat and wildlife.

21.     The actions of Defendants not only harm the procedural interests of Plaintiffs and their members, but also have harmed and threaten future harm to the concrete interests that Plaintiffs, their members and staff have in the fish, wildlife and ecosystems of the United States that are being ravaged by coal mining activities.

22.     The interests and organizational purposes of Plaintiffs and their staff and members are directly and irreparably injured by Defendants' violations of law as described in this Complaint.  Unless this Court grants the requested relief and orders Defendants to comply with the ESA and APA, harm to protected species will continue to accrue, and the aesthetic,

recreational, educational, professional, scientific, spiritual, and conservation interests of Plaintiffs and their staff and members will continue to be adversely affected.

23.     These are actual, concrete injuries to Plaintiffs, caused by the Service's and OSMRE's failure to comply with the APA, the ESA, and its implementing regulations.  The relief requested will directly redress those injuries.  Plaintiffs bring this action on their own behalf and on behalf of their adversely affected members and staff.

24.     Defendant UNITED STATES FISH AND WILDLIFE SERVICE is the United States federal agency that jointly shares responsibility with the National Marine Fisheries Service for insuring that the requirements of the ESA are followed and enforced.  These requirements include insuring that coal mining activities undertaken pursuant to SMCRA and state-delegated programs do not jeopardize the continued existence of listed species or adversely modify critical habitat.

25.     Defendant DAVID BERNHARDT is sued in his official capacity as Acting Secretary of the U.S. Department of the Interior.

26.     Defendant MARGARET EVERSON is sued in her official capacity as Director of the U.S. Fish and Wildlife Service.

27.     Defendant OFFICE OF SURFACE MINING RECLAMATION AND ENFORCEMENT is the United States federal agency that has responsibility to insure that the requirements of applicable laws are followed and enforced with respect to the implementation of SMCRA and state-delegated SMCRA programs.  These requirements include compliance with the ESA.

28.     Defendant GLENDA OWENS is sued in her official capacity as Director of the Office of Surface Mining Reclamation and Enforcement.

## IV.     STATUTORY BACKGROUND

### A.     The Endangered Species Act

29.     With the ESA, Congress intended endangered species to be afforded the highest of

priorities.  The ESA's purpose is "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species."  16 U.S.C. § 1531(b).

30.     Under the ESA, conservation means "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary."  *Id*. § 1532(3).

31.     The ESA assigns responsibility to implement the statute to the Secretaries of Commerce and Interior, which in turn have delegated responsibility to the National Marine Fisheries Service and the U.S. Fish and Wildlife Service, respectively.  50 C.F.R. § 402.01(b).

32.     Under Section 7 of the ESA, federal agencies must "utilize their authorities in furtherance of the purposes of" the ESA and carry out "programs for the conservation of endangered species and threatened species."  16 U.S.C. § 1536(a)(1).

33.     To fulfill the substantive purposes of the ESA, federal agencies are required to engage in Section 7 consultation with the Service to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined . . . to be critical."  *Id*. § 1536(a)(2).

34.     Section 7 consultation is required for "any action [that] may affect listed species or critical habitat."  50 C.F.R. § 402.14.  Agency "action" is defined broadly in the ESA's implementing regulations to include "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies," such as the promulgation of regulations, the granting of permits, or actions directly or indirectly causing modifications to the land, water, or air.  *Id*. § 402.02.

35.     The duties in ESA Section 7 are only fulfilled by an agency's satisfaction of the consultation requirements that are set forth in the implementing regulations for Section 7 of the ESA, 50 C.F.R. §§ 402.10-402.16, and only after the agency lawfully complies with these requirements may an action that "may affect" a protected species go forward.

9

36.     Each federal agency must review its actions at "the earliest possible time" to determine whether any action "may affect" listed species or their critical habitat in the "action area." *Id.* § 402.14(a).  The "action area" encompasses all areas that would be "affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." *Id.* § 402.02.  The term "may affect" is broadly construed to include "[a]ny possible effect, whether beneficial, benign, adverse, or of an undetermined character," and thus is easily triggered. *Interagency Cooperation – Endangered Species Act of 1973, As Amended*, 51 Fed. Reg. 19,926 (June 3, 1986).

37.     If an action agency concludes that the action is "likely to adversely affect" listed species or critical habitat, the agency must engage in "formal consultation" with the Service to meet the ESA's substantive "no jeopardy" mandate.  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14.

38.     Formal ESA consultation commences with the action agency's written request for consultation and concludes with Service's issuance of a "biological opinion."  50 C.F.R. § 402.14(g)(4).  During formal consultation, the Service and the action agency must evaluate the "effects of the action," including all direct and indirect effects of the proposed action, plus the effects of actions that are interrelated or interdependent, added to all existing environmental conditions—that is, the "environmental baseline." *Id.* § 402.02.  The environmental baseline includes the "past and present impacts of all Federal, State, or private actions and other human activities in the action area . . . ." *Id.*  The effects of the action must be considered together with "cumulative effects," which are "those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation." *Id*.

39.     The biological opinion states the Service's opinion as to whether the effects of the action are "likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." *Id*. § 402.14(g)(4).  To "jeopardize the continued existence of" means "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed

10

species in the wild by reducing the reproduction, numbers, or distribution of that species." *Id.* § 402.02. The determination of whether an activity is likely to jeopardize the continued existence of a species must be based solely on "the best scientific and commercial data available," 16 U.S.C. § 1536(a)(2), and the Service must use the best available science in formulating its biological opinion and approving incidental take through formal consultation. 50 C.F.R. § 402.14(g)(8).

40.     If the Service determines that the action is likely to jeopardize a species, the biological opinion must outline "reasonable and prudent alternatives" to the action, if any exist, that will avoid jeopardy and "which [the agency] believes would not violate [Section 7(a)(2)]." *Id.* § 1536(b)(3)(A); 50 C.F. R. § 402.14(h)(3). The Service may also "suggest modifications" to the action during the course of consultation to "avoid the likelihood of adverse effects" to the listed species even when not necessary to avoid jeopardy. 50 C.F.R. § 402.13(b).

41.     The Service also engages in "programmatic consultation" to guide the implementation of Federal programs by establishing standards, guidelines, or governing criteria to avoid, minimize, or offset the effects of the program on listed species and critical habitat. Pursuant to the Services' revised regulations defining "framework programmatic action," programmatic consultations, such as for the SMCRA program, should not result in the issuance of an ITS. Rather, any incidental take must be subsequently authorized under a project-specific Section 7 consultation, or by the applicant producing a habitat conservation plan and obtaining an incidental take permit through ESA Section 10. *See* 80 Fed. Reg. 26,832 (May 11, 2015) (adding definition of "framework programmatic action" to 50 C.F.R. § 402.02 and adding 50 C.F.R. § 402.14(i)(6) on incidental take statements not being issued at the programmatic level).

42.     Pursuant to Section 7(b)(4) of the ESA, an ITS must specify the impact of any allowable takes of individual members of the species, provide reasonable and prudent measures ("RPMs") necessary to minimize the impact of those takes, and set forth terms and conditions that must be followed to implement such measures. 16 U.S.C. § 1536(b)(4); 50 C.F. R. § 402.14(i)(1), (3).

11

43.     The ESA requires the Service to conclude the formal consultation process within 90 days of the date such consultation was initiated, unless the Service and the action agency agree to extend the consultation for a specific time period.  16 U.S.C. § 1536(b)(1)(A); 50 C.F.R. § 402.14(e).

44.     After the issuance of a biological opinion and "where discretionary Federal involvement or control over the action has been retained or is authorized by law," the action agency and the Service must reinitiate formal consultation if, *inter alia*, "[t]he amount or extent of taking specified in the incidental take statement is exceeded; new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered; the identified action is subsequently modified in a manner that causes an effect to the listed species ... that was not considered in the biological opinion; or a new species is listed or critical habitat designated that may be affected by the identified action."  50 C.F.R. § 402.16.

45.     Section 7(d) of the ESA provides that once a federal agency initiates or reinitiates consultation under the ESA, the agency, as well as any applicant for a federal permit, "shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a)(2) of this section."  16 U.S.C. § 1536(d).  The purpose of Section 7(d) is to maintain the environmental status quo pending the completion of consultation.  Section 7(d) prohibitions remain in effect throughout the consultation period and until the federal agency has satisfied its obligations under Section 7(a)(2) that the action will not result in jeopardy to listed species or adverse modification of critical habitat.

## B.     The Administrative Procedure Act (APA)

46.     The APA provides for judicial review of federal agencies' and officials' compliance with the APA's own procedural requirements, and provides the standard of review for ESA citizen suit claims.  Under the APA, courts "shall . . . hold unlawful and set aside agency

action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2).  The APA also allows courts to "compel agency action unlawfully withheld or unreasonably delayed."  *Id*. § 706(1).

## V.     FACTUAL and REGULATORY BACKGROUND

### A.  Coal Mining Under SMCRA

47.     Surface coal mining is accomplished by logging or clearing the mine site, then removing overburden from the coal seam and blasting and removing the coal.  This includes strip mining and open pit mining practices, as well as mountaintop removal mining, wherein excess mining waste is dumped into fills in nearby hollows or valleys, smothering streams and habitat.

48.     Surface coal mining requires large areas of land disturbance, destroying mountains and forest habitat, and results in the deposition of sediment and heavy metals into waterbodies, which adversely impacts streams and local biodiversity.  These impacts harm species, including an increasing number of species that are listed as endangered or threatened under the ESA.  Several of these species were listed since the Service issued the 1996 Biological Opinion.

49.     Surface coal mining in the U.S. is regulated pursuant to SMCRA.  OSMRE is the primary regulator of coal mining under SMCRA, until a State or Indian Tribe demonstrates that it has developed a regulatory program that meets all of the requirements of SMCRA and the implementing regulations issued by OSMRE under 30 C.F.R. Chapter VII.  A State or Indian Tribe becomes the primary regulator within its jurisdiction when it submits and receives approval of its proposed regulatory program from OSMRE, assuming responsibility over permitting, inspection, and enforcement activities.

50.     Even after a SMCRA program has been delegated to a State or Tribe, OSMRE retains oversight of that program through funding and supervision of the State's or Tribe's

implementation of the regulatory program.  OSMRE further maintains federal oversight over state

SMCRA programs by funding them on an ongoing basis.

51.     This oversight role was reaffirmed in a Memorandum of Understanding between

the U.S. Army Corps of Engineers, Department of the Interior and the Environmental Protection

Agency regarding Appalachian coal mining, wherein OSMRE agreed to "determine how it will

more effectively conduct oversight of State permitting, State enforcement, and regulatory

activities under SMCRA," and to "remove impediments to its ability to require correction of

permit defects in SMCRA primacy states."[1]

52.     SMCRA specifically requires that OSMRE evaluate and oversee the administration

of approved state programs, and requires that OSMRE enforce the terms of the statute should it

find that the State has failed to adequately enforce its state-delegated SMCRA program.  30

U.S.C. § 1271(b); 30 C.F.R. §§ 780.16, 773.15(j), 842.11.  OSMRE therefore retains discretion

and control over the SMCRA program, even where the program has been delegated to a state

authority.

### B.  The 1996 Biological Opinion and Incidental Take Statement

53.     Pursuant to ESA Sections 7(a)(1) and (2), OSMRE must carry out a program for

the conservation of listed species and insure that coal-mining activities undertaken pursuant to

SMCRA do not jeopardize the continued existence of listed species.

54.     In 1995, OSMRE initiated formal consultation with the Service under Section 7 of

the ESA for all SMCRA permitting programs, state or federal, nationwide.  A year later, the

Service issued the 1996 Biological Opinion.

---

[1]  Memorandum of Understanding Among the U.S. Department of the Army, U.S. Department of
the Interior and U.S. Environmental Protection Agency Implementing the Interagency Action
Plan on Appalachian Surface Coal Mining at 3 (June 11, 2009).

55.     Although it failed to include or analyze any site-specific or species-specific information about affected species or designated critical habitat, the 1996 Biological Opinion concluded that surface coal mines regulated by "properly implemented" SMCRA programs "are not likely to jeopardize the continued existence of listed or proposed species" or "result in the destruction or adverse modification of designated or proposed critical habitats."  1996 Biological Opinion at 10.

56.     The 1996 Biological Opinion purports to provide incidental take coverage for all coal operations nationwide, and provides authorization for the take of "all present and future Federally listed and proposed species" affected by SMCRA-regulated mining operations at any mine site.  *Id.* at 6.  It assigned "an unquantifiable level of take" to surface coal mining operations and authorized "the unavoidable taking of some individuals" of any listed species affected by surface coal mining.  *Id.* at 11.

57.     According to the Service, "the likelihood and extent of incidental take" of all listed species by surface coal mining would be minimized by a "planning and coordination process" between the Service, OSMRE and state agencies, which requires compliance with SMCRA regulations that purportedly prohibit the taking of an endangered or threatened species in violation of the ESA, as well as compliance with the terms and conditions of the 1996 Biological Opinion and ITS.  *Id.* at 10-13.

58.     The 1996 Biological Opinion and ITS do not provide any reasonable and prudent measures ("RPMs") to minimize the impact of incidental take.  The only RPM provided in the 1996 Biological Opinion is compliance with the terms and conditions of the ITS.

59.     The terms and conditions of the 1996 Biological Opinion and ITS provide no specific measures to minimize impacts to listed species, but rather require the Service, in

coordination with OSMRE and the relevant delegated state authority, to develop and implement species-specific measures to minimize impacts to listed species, which the regulatory authority can then decide not to implement.  1996 Biological Opinion at 13.

60.     To implement the species-specific measures to minimize take under the 1996 Biological Opinion, OSMRE and state regulatory authorities require Protection and Enhancement Plans ("PEPs") for species at specific mine sites, which must "include a description of how, to the extent possible using the best technology currently available, the operator will minimize disturbances and adverse impacts on fish and wildlife and related environmental values, including compliance with the Endangered Species Act. . . ."  30 C.F.R. § 780.16(b).

61.     The Service fulfills its duty to provide species-specific measures to minimize take of listed species by promulgating guidance documents for the development of PEPs.  However, the Service has only provided PEP guidance for some listed species, such as the Indiana bat, blackside dace and recently-listed crayfish species, but not for all species that may be impacted by surface mining, including northern long-eared bats, diamond darters, Kentucky arrow darters, or numerous freshwater mussels, such as the spectaclecase and northern riffleshell.

62.     Pursuant to the 1996 Biological Opinion, OSMRE must insure that adequate PEPs are being provided with species-specific measures to minimize take.  The 1996 Biological Opinion provides that OSMRE has a continuing responsibility to monitor compliance with the terms of the ITS (i.e. implementation of the species-specific measures), otherwise its protective coverage lapses.  1996 Biological Opinion at 11.

63.     The 1996 Biological Opinion provides two specific pathways to reinitiation of Section 7 consultation.  It states that reinitiation is necessary where: "(1) new information reveals that the agency action may affect listed species or critical habitats in a manner or to an extent not

considered in this opinion, or (2) the agency action is modified in a manner that causes an adverse effect to listed species or critical habitat that was not considered in this opinion." *Id*. at 14.  The 1996 Biological Opinion fails to provide for reinitiation when "a new species is listed or critical habitat designated that may be affected by the identified action," as set forth in the ESA implementing regulations.  50 C.F.R. § 402.16(d).

### C. The Stream Protection Rule and 2016 Biological Opinion

64.     In 2015, pursuant to Title V of SMCRA, Defendant OSMRE undertook efforts to revise a set of regulations known as the Stream Protection Rule ("SPR"), in order to better protect streams, fish, and wildlife from the adverse impacts of surface coal mining operations.

65.     As a result of the changes that were proposed to the SMCRA regulations as part of the revised SPR, Defendants conceded that OSMRE could no longer rely on the 1996 Biological Opinion to meet its ESA Section 7 duties, and therefore OSMRE entered into formal programmatic consultation with the Service in order to devise a new mechanism for avoiding jeopardy to listed species.  On December 16, 2016, the Service issued a new biological opinion (the "2016 Biological Opinion"), which specifically stated that "[t]he 1996 Biological Opinion is being superseded by this programmatic Opinion and will no longer provide protections against the take prohibitions of section 9 of the ESA for future permitting decisions."  2016 Biological Opinion at 3.

66.     In the 2016 Biological Opinion, the Service stated that "the 1996 Opinion's technical assistance permit review process has not been implemented consistently and has led to insufficient protection of ESA-listed resources." *Id*. at 122.  In response to this finding, OSMRE and the Service developed a Memorandum of Understanding ("2016 MOU") to "improve interagency coordination and cooperation and insure that proposed, threatened, and endangered

17

species and proposed and designated critical habitat are adequately protected for all surface coal mining and reclamation operations and coal exploration conducted under SMCRA." *Id.* at 2.

67. The 2016 Biological Opinion made it clear that the 1996 Biological Opinion had been withdrawn and was no longer valid, and that all new permits, as well as all revisions to previously approved permits where a revision would change the manner or extent of effects to species, would require completion of the technical assistance process identified in the 2016 Biological Opinion and MOU. Alternatively, a separate Section 7 consultation or Section 10 habitat conservation plan would be required.

68. In issuing the 2016 Biological Opinion, the Service was emphatic and unequivocal as to the failure of the 1996 Biological Opinion to protect listed species in accordance with the ESA's mandates, and the consequent need to reinitiate programmatic consultation. The 2016 Biological Opinion stated that:

> Even if the Stream Protection Rule did not constitute a significant change to the regulatory environment, the 1996 Biological Opinion would require reinitiation of consultation because there have been effects to ESA resources (listed and proposed species and designated and proposed critical habitat) not considered in the 1996 analysis and because the technical assistance process analyzed in the 1996 Biological Opinion has not been consistently implemented nationwide, as analyzed in that consultation. As a result of new effects and inconsistent implementation of the technical assistance process, many fish and wildlife species continue to decline. Several species in coal mining regions have been listed since conclusion of the 1996 consultation, suggesting the protections afforded to fish and wildlife resources from the existing SMCRA regulations and implementation of the 1996 Biological Opinion may not be as protective as previously considered. Given the contribution of surface coal mining to the decline of some species and the new listing of species that previously did not require protection under the ESA, and evidence that the technical assistance process outlined in the 1996 Biological Opinion is not being followed, *it is no longer possible to rely on the 1996 Biological Opinion to conclude that the existing regulatory environment (prior to 2016 MOU and Stream Protection Rule implementation) would not result in jeopardy or adverse modification of ESA-listed resources.*

> 2016 Biological Opinion at 31-32 (emphasis added).

18

69.     The Service concluded that "despite the environmental protections granted by SMCRA and the permit review process set forth in the 1996 Biological Opinion, surface coal mining operations continue to negatively impact threatened and endangered species and the habitats upon which they depend." *Id*. at 106.  It further found that the implementation of the 1996 Biological Opinion failed to insure that physical, chemical, or biotic stressors were reliably estimated; that adverse effects to ESA-listed species and critical habitat were not being evaluated, monitored and minimized; and that permit compliance was not being enforced. *Id.* at 121.

70.     The Service further acknowledged that the program for ESA compliance set forth in the 1996 Biological Opinion is resulting in jeopardy to listed species, stating in the 2016 Biological Opinion that "it is no longer possible to rely on the 1996 Biological Opinion to conclude that the existing regulatory environment (prior to 2016 MOU and Stream Protection Rule implementation) would not result in jeopardy or adverse modification of ESA-listed resources." *Id*. at 32.

71.     The Service also noted that new species listings required OSMRE and the Service to revisit the efficacy of the 1996 Biological Opinion, stating that the recent listing of the Big Sandy crayfish and the Guyandotte River crayfish "illustrate the inadequacy of the current SMCRA regulatory environment in protecting fish and wildlife and the habitats upon which they depend." *Id*. at 121.

72.     On February 2, 2017, Congress used the Congressional Review Act to rescind the 2016 revisions to the SPR.  Although the Service and OSMRE maintained that this action also nullified the 2016 Biological Opinion and MOU pertaining to the new SPR, the Service has never disclaimed the findings it made in the 2016 Biological Opinion establishing that the 1996

Biological Opinion and ITS do not comply with the ESA's mandates and thus cannot lawfully be relied on for ESA compliance.

73.     Following the rescission of the 2016 SPR, by letter to the Service dated April 13, 2017, OSMRE formally requested reinitiation of formal ESA consultation on the SMCRA program.  OSMRE specifically stated in its letter that reinitiation is appropriate pursuant to 50 C.F.R. § 402.16, and that it expects the reinitiated consultation to include new science and cover all aspects of OSMRE's implementation of SMCRA, oversight of state programs under the existing regulations, and OSMRE's oversight of state program compliance with requirements related to the protection and enhancement of proposed or listed species and proposed or designated critical habitat.

74.     When OSMRE and the Service reinitiated consultation, the Service simultaneously reinstated the 1996 Biological Opinion, and affirmed that during the reinitiation of consultation OSMRE and state regulatory authorities may continue to rely on the 1996 Biological Opinion and ITS.  At this time, more than two years later, neither the Service nor OSMRE have given any indication to the public as to if or when the reinitiated consultation will ever be completed.  In the meantime, the reinstated, inadequate, and unlawful 1996 Biological Opinion continues to establish the framework for Defendants' compliance with section 7 of the ESA.

75.     OSMRE and the Service have also issued a document outlining a SMCRA-ESA coordination and elevation process to be used pending completion of consultation; however, that document provides no requirements for site-specific ESA consultations or species-specific analysis beyond what is required pursuant to the 1996 Biological Opinion, and relies on the same flawed PEP-based process as the 1996 Biological Opinion.

### D.  **The Crayfish PEP Guidance**

76.     Following the listing of the Guyandotte River crayfish and Big Sandy crayfish in 2016, WVDEP began developing guidance for mining projects that may affect those species, entitled "Guide to Consideration of Potential Mining-related Impacts on the Guyandotte River and Big Sandy River Crayfishes" ("WV Crayfish Guidance").

77.     The WV Crayfish Guidance provides a key that establishes when crayfish PEPs would be required for mining projects, but provides no guidance on what information those PEPs must contain.  It requires that state water quality standards ("WQS") be maintained at mining sites to prevent harm to crayfish, claiming that no additional criteria are needed to protect the species. It also provides guidelines for sediment monitoring and adaptive management.

78.     Pursuant to the WV Crayfish Guidance, PEPs would not be required unless a survey indicated that listed crayfish are present in relevant stream segments.  However, the guidance only requires presence/absence surveys in those streams that "immediately impact" 3rd order streams (i.e. headwater streams in the upper reaches of the watershed) with a known occurrence of crayfish, or tributaries of such stream segments when the mining project is less than 500 meters from the confluence of the 3rd order stream segment.

79.     Biologists with the Service's regional office determined that the WV Crayfish Guidance was inadequate, and made it very clear in communications with WVDEP that the WV Crayfish Guidance was insufficient and not based on the best available science.  Specifically, the Service stated that the WV Crayfish Guidance's 500 meter "impact" threshold was arbitrary, and that existing state WQS are insufficient to insure that crayfish are protected from mining activities.  The regional Service personnel provided suggested changes to the WV Crayfish Guidance.  These edits would have required a PEP for all new mines in the watersheds of listed

crayfish, and removed the state's reliance on WQS to prevent take of crayfish from sediment and other pollutants.

80.     WVDEP ignored the Service and lobbied then-Interior Secretary Ryan Zinke to force the Service to allow WVDEP to continue to rely on its own guidance for crayfish.  The WV Crayfish Guidance was ultimately signed on June 28, 2017, by Department of Interior staff member Vincent Devito, the former Counselor to the Secretary for Energy Policy for DOI.  Mr. Devito signed the WV Crayfish Guidance without consulting the Service personnel at the regional office that had provided commentary indicating that the WV Crayfish Guidance did not comply with the law, and was insufficient to insure that crayfish were adequately protected.

81.     Meanwhile, on July 12, 2017, the Service developed its own guidance document setting forth the protocols that Service biologists at the regional office believe are necessary to insure that crayfish are not jeopardized by coal mining activities ("2017 Guidance").  The Service's 2017 Guidance would have required a PEP for all projects within a HUC-10 watershed that has known occurrences of crayfish, as well as any HUC-12 watershed that is "likely important to the recovery of" the crayfish, and did not rely on state WQS for ESA compliance.[2]

82.     According to emails obtained through the Freedom of Information Act ("FOIA"), the regional Service personnel were told by their superiors at DOI to abandon the 2017 Guidance and to take the WV Guidance signed by Mr. Devito as a basis for a new guidance document. Under pressure from political appointees, the regional office made minor changes to the WV Crayfish Guidance, which was re-issued by the Service on March 28, 2018 ("2018 Guidance").

---

[2]  HUC is the acronym for Hydrologic Unit Code (HUC).  Every hydrologic unit is identified by a unique HUC consisting of 2 to 12 digits based on the levels of classification in the hydrologic unit system.  A hydrologic unit describes the area of land upstream from a specific point on the stream (generally the mouth or outlet) that contributes surface water runoff directly to this outlet point, also referred to as the drainage area.  HUC-10 denotes a watershed, typically an area from 40,000-250,000 acres.  HUC-12 denotes a sub-watershed, typically from 10,000-40,000 acres.

The March 28, 2018 version of the Service's crayfish guidance differs in only minor respects from the WV Crayfish Guidance.

83.     The Service's 2018 Guidance uses presence/absence surveys to determine when a PEP will be required, but as with the WV Crayfish Guidance it merely provides a key to establish when a PEP is required, with no guidance as to what information the PEP must contain.

84.     The Service's 2018 Guidance also relies on compliance with state WQS to insure that crayfish will not be adversely impacted, ignoring the Service personnel's prior comments regarding the inability of West Virginia's WQS to protect listed crayfish because they do not adequately control for sedimentation or other pollutants, such as conductivity, and may allow for selenium levels that will harm crayfish.  Therefore, the Service's 2018 Guidance, which did not undergo section 7 consultation, does not reflect the best available science and is insufficient to insure that listed crayfish are not jeopardized by coal mining activities.

85.     The Service's 2018 Guidance does not comply with applicable regulations at 30 C.F.R. §780.16 or Section 7 of the ESA, in part because the Service has never made any determination, nor can it, that compliance with the Guidance would avoid jeopardy to listed species, much less provide for enhancement of crayfish habitat.

### E.  Recent Data Regarding Impacts of Coal Mining on Listed Species

86.     Coal mining practices have adverse effects on several aspects of the biological, chemical, and physical environment.  These adverse impacts include: fragmentation of habitats; degradation of habitat quality; exposure of biota to changed chemical conditions in aquatic environments; and permanent loss of terrestrial and aquatic habitat.

87.     Data published since 1996 document increasingly significant declines in numerous imperiled and federally protected taxa, and degradation of their habitats, as the result of surface coal mining.  Coal mining is contributing to the alarming loss of species and the habitats they

depend on.  This has been evidenced by the vast upswing in aquatic dependent species requiring ESA protection in the Southeast region.  Further, already-listed species in the region are also experiencing ongoing declines due to downstream impacts from surface mining, and existing regulations are failing to protect species from these impacts.

88.     Allowing land-clearing at coal mines irreversibly and irretrievably eradicates the forest habitat resources that listed species depend upon, and forecloses the implementation of measures to minimize take of species, such as the preservation of forest canopy and buffers to protect waterways.

### i.     Harm to Guyandotte River and Big Sandy Crayfish from Coal Mining

89.     In 2016, the Service listed two species of crayfish that are adversely affected by coal mining.  The Guyandotte River crayfish (*Cambarus veteranus*) and Big Sandy crayfish (*Cambarus callianus*) are freshwater crustaceans that resemble a miniature lobster, ranging from 3-4 inches in size.

90.     The Guyandotte River crayfish was listed by the Service as an endangered species on April 7, 2016.  81 Fed. Reg. 20,450 (Apr. 7, 2016).  Today, after suffering a 92% decline across its historic range in the Upper Guyandotte River drainage of West Virginia's coalfields, this species is only found in two streams, both in Wyoming County.

91.     The Big Sandy crayfish was listed by the Service as a threatened species on April 7, 2016.  *Id.*  Overall, this species has lost 62% of its historic range across the Appalachian coalfields, including in the Upper Big Sandy drainage in southern West Virginia.  In recent years, the species has experienced short-term declines of 50-70%.

92.     Suitable instream habitat for the crayfish is generally described as clean, 3rd order or larger (width of 13 to 66 feet), fast-flowing, permanent streams and rivers with unembedded slab boulders on a bedrock, cobble, or sand substrate.  They are usually found in faster moving

24

sections of the water, in areas with large boulders and rocks, and little sedimentation or pollution. Widespread habitat loss and fragmentation of streams have significantly reduced the places where these species can be found.

93.     Surface coal mining-related activities, including mountaintop removal and construction and operation of mine-related haul roads, are the primary causes of habitat loss and degradation for the Guyandotte River crayfish and Big Sandy crayfish.  *Id*. at 20,466-68; 20,471-72.  These extractive activities drastically change the stream-bottom habitats these crayfish require, burying the substrate they rely on for food and shelter in sediment and degrading water quality through chemical pollution.  Mountaintop removal and associated valley fill activities also completely eradicate the streams necessary for the survival of these species.  The Service has acknowledged that "[o]f particular concern to the Guyandotte River crayfish are several active surface coal mines in the Pinnacle Creek watershed that may pose an immediate threat to the continued existence of that subpopulation, one of only two known to exist."  *Id*. at 20,467.

94.     The Service has determined that existing state and federal regulatory mechanisms, including the 1996 Biological Opinion and ITS, have proven inadequate to prevent the rapid habitat destruction and extirpation of these crayfish species from their ranges.  81 Fed. Reg. 20,473 (Apr. 7, 2016).  At the time of listing, the Service emphasized that these species are at risk of extinction due primarily to surface mining impacts.  Continued surface mining within these species' historic ranges will only exacerbate their continuing slide towards extinction.

95.     Defendants have continued to rely on the reinstated 1996 Biological Opinion to meet their ESA duties with respect to these crayfish.  Upon information and belief, after reinitiation of consultation was commenced on the SMCRA Program in April of 2017, permits for coal mining projects that may adversely affect listed crayfish have been issued by WVDEP in

reliance on the 1996 Biological Opinion and unlawful crayfish guidance, including permits for harmful mining activities in some of the last remaining habitat for Big Sandy and Guyandotte River crayfish, such as Eagle Surface Mine (Permit ID# S500613), which drains into Clear Fork – one of only two streams known to be occupied by the Guyandotte River crayfish.

> ii.   **Harm to Listed Bats from Coal Mining**

96.    Coal mining activities pose a significant risk to bats, including species listed under the ESA such as Indiana and northern long-eared bats.  The Service listed the Indiana bat as endangered in 1967, 32 Fed. Reg. 4,001 (March 11, 1967), and the northern long-eared bat as a threatened species in 2015, 80 Fed. Reg. 17,973 (April 2, 2015).

97.    These bats have been decimated by a disease known as white nose syndrome ("WNS"), which is caused by the fungus *Pseudogymnoascus destructans*.  WNS arrived in West Virginia in 2009.  The West Virginia Department of Natural Resources has documented a population decrease in bats of nearly 60 percent since WNS arrived in the state.  The bats are also threatened by habitat loss and exposure to contamination, including from the extensive logging and land clearing required for coal mines.

98.    Effects to bats from mining may occur through direct mortality, harassment, and habitat loss and degradation by elimination of forested roosting and foraging habitat.  Harassment of individuals living adjacent to surface coal mining operations may occur from the increased presence of human activity, noise, and dust generated during the mining process.  Such harassment could result in increased energetic costs associated with stress and abandonment of normal behaviors.

99.    Loss of suitable breeding, roosting, or foraging habitat from coal mining activities results in reduced breeding success and stress due to competition for remaining suitable habitat.

Fragmentation of forested habitats as a result of coal mining affects connectivity of bat breeding areas and therefore reduces genetic dispersal.  Population viability is affected if populations become isolated to the extent that adults and juveniles cannot successfully disperse between remaining patches. These effects result in fewer offspring and lowered population size.

100.    Defendants are continuing to rely on the reinstated 1996 Biological Opinion to meet their ESA duties with respect to listed bat species.  Upon information and belief, after reinitiation of consultation was commenced on the SMCRA Program in April of 2017, permits for coal mining projects that may adversely affect listed bat species have been issued in West Virginia, as well as in other states such as Virginia and Kentucky, in reliance on the reinstated 1996 Biological Opinion.

## VI.    CLAIMS FOR RELIEF

### CLAIM 1

**Violation of the Endangered Species Act Section 7(a)(2), 16 U.S.C. § 1536(a)(2) (The Reinstated 1996 Biological Opinion fails to insure that surface coal mining activities are not likely to jeopardize listed species or adversely modify critical habitat)**

101.    Plaintiffs re-allege and incorporate by reference, as if fully set forth herein, each and every allegation in the preceding paragraphs of this Complaint.

102.    OSMRE and the Service have an ongoing duty pursuant to ESA Section 7(a)(2) to insure that SMCRA-regulated mining activities are not likely to jeopardize the continued existence of endangered and threatened species or result in the destruction or adverse modification of such species' critical habitat.  16 U.S.C. § 1536(a)(2).

103.    OSMRE and the Service completed ESA Section 7 consultation on the SMCRA program in 1996, and continue to rely on the 1996 Biological Opinion and ITS to meet their duties pursuant to Section 7(a)(2) of the ESA.

104.    The Service has acknowledged that the 1996 Biological Opinion has failed to insure that species are protected from coal mining activities.  The 2016 Biological Opinion—

which explicitly superseded the 1996 Biological Opinion—specifically stated that "despite the environmental protections granted by SMCRA and the permit review process analyzed in the 1996 Biological Opinion, surface coal mining operations continue to negatively impact threatened and endangered species and the habitats upon which they depend."  2016 Biological Opinion at 106.  This is evidenced by the recent listing of the Big Sandy crayfish and the Guyandotte River crayfish, which "illustrate the inadequacy of the current SMCRA regulatory environment in protecting fish and wildlife and the habitats upon which they depend."  *Id.* at 121.  The Service has even acknowledged that "several active surface coal mines in the Pinnacle Creek watershed []may pose an immediate threat to the continued existence of" the Guyandotte River crayfish.  81 Fed. Reg. at 20,467.

105.    The Service has further admitted that the program for ESA compliance set forth in the 1996 Biological Opinion is resulting in jeopardy to listed species, stating in the 2016 Biological Opinion that "it is no longer possible to rely on the 1996 Biological Opinion to conclude that the existing regulatory environment… would not result in jeopardy or adverse modification of ESA-listed resources."  2016 Biological Opinion at 32.

106.    On April 13, 2017, OSMRE and the Service reinitiated consultation on the SMCRA program; however, that consultation has languished for over two years, and it remains unclear when or even if the agencies have any intention of completing that process.  Concurrently, in April 2017, the Service reinstated the previously withdrawn 1996 Biological Opinion and instructed the OSMRE and state regulatory authorities to once again rely on the 1996 Biological Opinion and ITS pending the completion of consultation.  2017 Reinitiation Letter.

107.    The reinstated 1996 Biological Opinion does not comply with ESA section 7(a)(2) or its implementing regulations and the Service has admitted that even full adherence to its terms will not prevent jeopardy to listed species or adverse modification of critical habitat.

28

108.    The reinstated 1996 Biological Opinion purports to provide incidental take coverage for all SMCRA-regulated coal operations as to all species for all time, although it failed to include or analyze any site-specific or species-specific information.  This overly broad take coverage does not meet the requirements of the Service's ITS regulations requiring the Service to specify the impacts on listed species, nor does it meet the regulatory requirements regarding reinitiation of consultation when new species are listed.  *See* 50 C.F.R. § 402.14(i)(l)(i), (4); 50 C.F.R. § 402.16(d).

109.    The reinstated 1996 Biological Opinion and ITS fail to include RPMs to minimize the impact of incidental take, as the ESA requires.  16 U.S.C. § 1536(b)(4)(C)(ii); 50 C.F.R. § 402.14(i)(1)(ii).  The only RPM provided in the 1996 Biological Opinion is compliance with the terms and conditions of the ITS; however, the terms and conditions likewise provide no specific measures to minimize impacts to listed species, but rather rely on the subsequent implementation of species-specific protective measures developed by the Service, which the regulatory authority can decide not to implement.  1996 Biological Opinion at 13.  The reinstated 1996 Biological Opinion and ITS therefore fail to provide terms and conditions that "must be complied with" to implement specific measures necessary to minimize impacts to listed species, as the regulations require.  50 C.F.R. § 402.14(i)(1)(iv).

110.    The terms and conditions of the 1996 ITS do not include any quantification of allowable take for any listed species and there is no provision in the ITS whereby the Service may assess the level of take in order to insure that authorized take levels are not being exceeded, thereby putting species in jeopardy.  Hence, the reinstated 1996 Biological Opinion and ITS cannot serve one of their most important functions: tracking the authorized take of a species in order to avoid authorizing so much take that jeopardy results, as the ESA requires.  16 U.S.C. § 1536(b)(4); 50 C.F.R. §§ 402.14(i)(1)(i), 402.14(i)(3) and 402.14(i)(4).

111.    The reinstated 1996 Biological Opinion is inconsistent with the Service's regulations regarding programmatic consultation, which state that such consultations should not

29

authorize incidental take, but that subsequent actions resulting in incidental take must undergo separate consultations at a site-specific level.  50 C.F.R. §§ 402.02, 402.14(i)(1)(6).

112.     The reinstated 1996 Biological Opinion therefore violates the ESA and its implementing regulations in multiple ways.  The Service's reissuance of, and the Service's and OSMRE's ongoing reliance on, the 1996 Biological Opinion contravenes the agencies' obligations to insure that SMCRA-regulated coal mining activities are not likely to jeopardize the existence of listed species or result in destruction or adverse modification of critical habitat, in violation of section 7(a)(2) of the ESA.  16 U.S.C. § 1536(a)(2).  The Service's reinstatement in 2017 of a Biological Opinion that the Service itself has declared to be inadequately protective of listed species, outdated, and not based on the best available science also constitutes agency action that is arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law within the meaning of the APA, 5 U.S.C. § 706(2).

## CLAIM 2

**Violation of the Endangered Species Act Section 7(a)(2), 16 U.S.C. § 1536(a)(2), and the Administrative Procedures Act, 5 U.S.C. § 706(1) (Failure to complete consultation on SMCRA program to insure that surface coal mining activities are not likely to jeopardize listed species or adversely modify critical habitat)**

113.     Plaintiffs re-allege and incorporate by reference, as if fully set forth herein, each and every allegation in the preceding paragraphs of this Complaint.

114.     OSMRE and the Service have an ongoing duty pursuant to ESA Section 7(a)(2) to insure that SMCRA-regulated mining activities are not likely to jeopardize the continued existence of endangered and threatened species or result in the destruction or adverse modification of such species critical habitat.  16 U.S.C. § 1536(a)(2).

115.     Since the issuance of the 1996 Biological Opinion, the factors requiring reinitiation of formal consultation under the ESA regulations and the terms of the 1996 Biological Opinion have been met, including new species listings and new information that reveals that coal mining is affecting listed species in a manner or to an extent not considered in the 1996 Biological Opinion. 50 C.F.R. § 402.16; 1996 Biological Opinion at 14.

116.     The Service has admitted that new information reveals that the effects of SMCRA-regulated coal mining undertaken pursuant to the 1996 Biological Opinion has adversely affected listed species to an extent not previously considered.  The 2016 Biological Opinion specifically states that "[a]s a result of new effects and inconsistent implementation of the technical assistance process, many fish and wildlife species continue to decline.  Several species in coal mining regions have been listed since conclusion of the 1996 consultation, suggesting the protections afforded to fish and wildlife resources from the existing SMCRA regulations and implementation of the 1996 Biological Opinion may not be as protective as previously considered."  2016 Biological Opinion at 32.  Therefore, reinitiation of consultation and completion of a new biological opinion is required under section 7(a)(2) and the ESA's implementing regulations to address new information on impacts to listed species, and to insure that such species are not jeopardized by coal mining activities.  50 C.F.R. § 402.16(b).  However, OSMRE and the Service have unlawfully failed to complete consultation to address this new information regarding the extent of impacts to listed species, including both species listed at the time of the 1996 Biological Opinion and species listed since that time.

117.     Several species that are adversely affected by SMCRA-regulated coal mining activities have been listed since the 1996 Biological Opinion was published, including the Guyandotte River crayfish, Big Sandy crayfish, northern long-eared bat, Kentucky arrow darter, and diamond darter.  The Service has conceded that new species listings required it to revisit the efficacy of the 1996 Biological Opinion, stating that the recent listing of the Big Sandy crayfish and the Guyandotte River crayfish "illustrate the inadequacy of the current SMCRA regulatory environment in protecting fish and wildlife and the habitats upon which they depend."  2016 Biological Opinion at 121.  In addition, the Service acknowledged in the 2016 Biological Opinion that the amount of take that was expected to occur under the process set forth in the 1996 Biological Opinion has been exceeded.  2016 Biological Opinion at 31-32, 106.  However, OSMRE and the Service have unlawfully failed to complete formal consultation to address either impacts on newly listed species or the additional level of take that has occurred beyond that

31

previously anticipated, as required under section 7(a)(2) and the ESA's implementing regulations. 50 C.F.R. § 402.16(a), (d); 50 C.F.R. § 402.14(i)(4).

118.    On April 13, 2017, OSMRE and the Service purported to reinitiate consultation on the SMCRA program.  Yet that process has carried on for over two years without any legitimate justification for this prolonged delay, and Defendants have provided no indication to the public as to if or when the reinitiated consultation will ever be completed.  In the meantime, Defendants are continuing to rely on the reinstated 1996 Biological Opinion, even though that opinion violates the ESA and its implementing regulations, and the Service has conceded that it is inadequate to satisfy the agencies' duties to avoid jeopardy to listed species as mandated by Section 7 of the ESA.  2016 Biological Opinion at 32.

119.    The Service's and OSMRE's failure, for more than two years following the purported reinitiation of consultation, to complete consultation regarding the effects of SMCRA-regulated coal mining on listed species and their critical habitats, and concomitant ongoing reliance on the unlawful reinstated 1996 Biological Opinion, constitutes a failure to insure that SMCRA-regulated coal mining activities are not likely to jeopardize the existence of listed species or result in destruction or adverse modification of critical habitat, in violation of section 7 of the ESA, 16 U.S.C. § 1536, and the ESA's implementing regulations.  Such action is also arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law within the meaning of the APA.  5 U.S.C. § 706(2).  The Service's failure to produce a new programmatic Biological Opinion in a reasonable time, when the Service knows that the reinstated 1996 Opinion is not based on the best available science and may be jeopardizing the continued existence of multiple species, also constitutes agency action that has been "unlawfully withheld or unreasonably delayed" in violation of the APA, 5 U.S.C. § 706(1).

## CLAIM 3

**Violation of the Endangered Species Act Section 7(a)(1), 16 U.S.C. § 1536(a)(1)
(Failure to carry out a program for the conservation of listed species)**

120.    Plaintiffs re-allege and incorporate by reference, as if fully set forth herein, each and every allegation in the preceding paragraphs of this Complaint.

121.    Under Section 7(a)(1) of the ESA, federal agencies must "utilize their authorities in furtherance of the purposes of" the ESA and carry out "programs for the conservation of endangered species and threatened species." 16 U.S.C. § 1536(a)(1).

122.    The program developed by the Service and OSMRE for the conservation of endangered and threatened species pursuant to the reinstated 1996 Biological Opinion has proven to be an abject failure.  The Service itself has conceded that the program for ESA compliance set forth in the 1996 Biological Opinion is not conserving—i.e., providing for the recovery of—listed species but, to the contrary, that "it is no longer possible to rely on the 1996 Biological Opinion to conclude that the existing regulatory environment … would not result in jeopardy or adverse modification of ESA-listed resources." 2016 Biological Opinion at 32.  Consequently, the Service and OSMRE are required by section 7(a)(1) of the ESA to consult for the purposes of developing an effective program for the conservation of listed species, including the recently listed species in West Virginia that are being adversely affected by ongoing mining activities. The Service and OSMRE have not completed an adequate programmatic consultation, and continue to rely on the unlawful 1996 Biological Opinion, and have thereby failed to carry out a program for the conservation of listed species, as the ESA requires.  16 U.S.C. § 1536(a)(1).

## CLAIM 4

**Violation of the Endangered Species Act, 16 U.S.C. §§1531-1544, SMCRA implementing regulations, 30 C.F.R. §780.16(b)(3), and the Administrative Procedure Act, 5 U.S.C. §§ 701-706 (Reliance on unlawful guidance regarding harm to listed species)**

123.    Plaintiffs re-allege and incorporate by reference, as if fully set forth herein, each and every allegation in the preceding paragraphs of this Complaint.

124.    The Service has adopted inadequate and unlawful guidance regarding the development of PEPs for the Guyandotte River crayfish and Big Sandy crayfish.  The Service's 2018 Guidance implements the unlawful process set forth in the 1996 Biological Opinion, which cannot be relied on for ESA compliance.  Furthermore, the Service's 2018 crayfish guidance does not comply with applicable ESA or SMCRA regulations; does not implement the best available science; and was promulgated absent Section 7 consultation.

125.    The adoption of the crayfish guidance by the Service was an agency action that "may affect" listed species, and the Service was therefore required to go through ESA Section 7 consultation regarding the impacts of that guidance on the listed crayfish.  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a) (requiring formal consultation for any agency action that may affect listed species or critical habitat).  Upon information and belief, the Service adopted the 2018 Guidance absent completing any ESA consultation whatsoever.

126.    The Service's 2018 crayfish guidance is not based on the best available science, as the ESA requires, since it relies on inadequate state WQS to provide protection for crayfish.  2018 Guidance at 2.  The Service's 2017 Guidance, developed by Service biologists at the agency's regional office, would not have relied on WQS to insure protection of crayfish.  This is because, among other reasons, the West Virginia WQS have not been reviewed to determine if they are protective of crayfish, as those standards were implemented before the crayfish were listed.  In addition, although crayfish may be adversely affected by high conductivity levels which are exacerbated by coal mining activities, West Virginia's WQS do not directly address conductivity at all.  The West Virginia WQS are therefore inadequate to protect crayfish, and the Service's reliance on them in the 2018 Guidance violates the best available science standard of the ESA, and is arbitrary and capricious. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(g)(8); 5 U.S.C. § 706(2).

127.    The Service's 2018 Guidance fails to provide species-specific measures to minimize take or enhance habitat, in contravention of the SMCRA implementing regulations, 30 C.F.R. §780.16(b)(3), as well as the requirements of section 7 of the ESA.  The crayfish guidance

merely sets forth a process for determining when a PEP will be required, along with water quality monitoring guidelines.  The Service failed to delineate the specific information that must be included in a PEP, and there is no discussion or analysis as to how listed crayfish will be protected, let alone enhanced, from the continuing contamination of their habitat from mining activities, as the regulations require.  *Id.*

128.    The Service's 2018 Guidance also fails to insure that PEPs will be completed for all mining projects that may affect listed crayfish, since it relies on presence/absence surveys that cannot possibly insure the avoidance of adverse effects to crayfish or their habitat.  The Service's 2017 Guidance would have required PEPs for all streams that may be occupied by crayfish or are important to the recovery of the species, rather than rely on presence/absence surveys.  These crayfish are highly imperiled and increasingly rare due to the rapid, ongoing collapse of their populations across their ranges.  Due to the scarcity of these crayfish and the extremely small size of many extant populations, it is likely that surveys will not be able to determine their presence or absence with any certainty.  As such, the 2018 Guidance allows for mines to proceed in potential crayfish habitat without the protections of a PEP, simply because a particular survey may have failed to turn up individual crayfish.

129.    Upon information and belief, the regional office was forced to abandon the Service's 2017 Guidance and adopted the 2018 Guidance following pressure from political appointees within the Interior Department.  Upon information and belief, these political appointees in the Interior Department were, in turn, lobbied by mining companies and others, including mining regulators in West Virginia, to adopt weaker guidelines.  These changes were therefore not based on the best available science, as mandated by section 7 of the ESA, and were otherwise impossible to harmonize with the conservation purposes of either the ESA or the SMCRA regulatory scheme.

130.    The Service's 2018 Guidance therefore violates both the procedural and substantive requirements of ESA Section 7(a)(2), and further fails to provide species-specific measures to minimize take or enhance habitat, as the SMCRA regulations require.  16 U.S.C. §

1536(a)(2); 30 C.F.R. §780.16(b)(3).  The Service's adoption and reliance on the 2018 Guidance is arbitrary and capricious agency action, in violation of the ESA and APA.  5 U.S.C. § 706(2).

## CLAIM 5

**Violations of the Endangered Species Act Section 7(d), 16 U.S.C. § 1536(d), SMCRA implementing regulations, and the Administrative Procedure Act, 5 U.S.C. §§ 701-706 (Irreversible and irretrievable commitment of resources pending completion of consultation)**

131.     Plaintiffs re-allege and incorporate by reference, as if fully set forth herein, each and every allegation in the preceding paragraphs of this Complaint.

132.     On April 13, 2017, OSMRE and the Service reinitiated formal ESA Section 7 consultation on the SMCRA program in order to consider the effects of surface coal mining and reclamation on listed species, and to replace the 1996 Biological Opinion with a new programmatic ESA consultation.  The Service has not provided any specific timeframe for completing the reinitiated consultation, and it is not clear whether the agencies have any intention of completing that process.  In the meantime, Defendants are continuing to rely on the unlawful reinstated 1996 Biological Opinion, even though the Service has acknowledged that the program for ESA compliance set forth in that Opinion is inadequate to prevent jeopardy to listed species. 2016 Biological Opinion at 32.

133.     Pursuant to ESA Section 7(d), once a federal agency initiates or reinitiates consultation under the ESA, the agency, as well as any applicant for a federal permit, "shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a)(2) of this section."  16 U.S.C. § 1536(d).  The purpose of Section 7(d) is not only to maintain the environmental status quo pending the completion of consultation, but also to prevent agencies and private parties from foreclosing conservation options that might otherwise be available upon the completion of consultation.

134.    On information and belief, State regulatory authorities, including WVDEP, are continuing to issue permits in reliance on the reinstated 1996 Biological Opinion pending completion of the reinitiated consultation on the SMCRA program.  The ongoing issuance of permits for surface coal mining during formal consultation on the SMCRA program is an unlawful, irretrievable and irreversible commitment of resources.  The issuance of such permits will result in activities, such as land clearing and mining activities, that both directly harm listed species and foreclose the implementation of mitigation or other measures (*i.e.* avoidance protocols and riparian buffers) to prevent harm to affected species.

135.    Defendants have failed to take action to prevent the ongoing take of listed species that is occurring under the program set forth in the 1996 Biological Opinion.  The ongoing issuance of SMCRA permits in reliance on the unlawful 1996 Biological Opinion following reinitiation of programmatic consultation is in direct violation of ESA Section 7(d), 16 U.S.C. § 1536(d).  Defendants' failure to provide oversight for state-delegated SMCRA programs and to enforce the provisions of the ESA is arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law, in violation of the ESA and APA.  16 U.S.C. § 1536(d); 5 U.S.C. § 706(2); *see also* 30 U.S.C. § 1271(b); 30 C.F.R. §§ 780.16, 773.15(j); 30 C.F.R. § 842.11.

## VII.    PRAYER FOR RELIEF

For the reasons stated above, Plaintiffs respectfully request that the Court grant the following relief:

1.    Declare that Defendants violated the ESA and its implementing regulations by failing to insure through formal programmatic ESA consultation that their actions will not jeopardize the continued existence of threatened or endangered species, or destroy or adversely modify such species' critical habitats;

2.    Declare that Defendants are in violation of the requirements of Sections 7(a)(2) and 7(d) of the ESA by continuing to rely on the reinstated 1996 Biological Opinion and ITS;

3.      Declare that the reinstated 1996 Biological Opinion and ITS are unlawful and is insufficient to fulfill the ESA Section 7(a)(2) requirement to prevent jeopardy to listed species, and vacate and enjoin any further reliance on the 1996 Biological Opinion and ITS;

4.      Declare that the Service and OSMRE have failed to implement a program for the conservation of listed species in violation of ESA Section 7(a)(1);

5.      Declare that the Service's 2018 crayfish guidance is unlawful and enjoin any further reliance on the crayfish guidance for ESA compliance;

6.      Declare that Defendants are in violation of the APA, 5 U.S.C. § 706(1), and compel Defendants to complete the reinitiated consultation, including through issuance and adoption of a new Biological Opinion, by a date certain to be determined by the Court;

7.      Award Plaintiffs costs and attorneys' fees under the ESA, 16 U.S.C. § 1540(g); and

8.      Grant Plaintiffs such other and further relief as the Court deems just and equitable.

DATE: September 4, 2019                    Respectfully Submitted,

/s/ Jared M. Margolis
Jared M. Margolis (OR Bar No. 146145)
CENTER FOR BIOLOGICAL DIVERSITY
2852 Willamette St. # 171
Eugene, OR 97405
Phone: (802) 310-4054
Email: jmargolis@biologicaldiversity.org

Attorney for Plaintiff Center for Biological Diversity

/s/ Benjamin A. Luckett
Benjamin A. Luckett (WV Bar No. 11463)
Appalachian Mountain Advocates
P.O. Box 507
Lewisburg, WV 24901
Phone: (304) 645-0125
Email: bluckett@appalmad.org

Local Attorney and Attorney for Sierra Club, West
Virginia Highlands Conservancy and Ohio Valley
Environmental Coalition